**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HUMANOIDS GROUP,
            *Plaintiff-Appellant,*

v.

JAMES E. ROGAN, Director of the
United States Patent and Trademark
Office,
            *Defendant-Appellee.*

No. 03-1896

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-02-1419)

Argued: June 2, 2004

Decided: July 20, 2004

Before MOTZ and KING, Circuit Judges,
and David R. HANSEN, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed in part and dismissed in part by published opinion. Judge
Motz wrote the opinion, in which Judge King and Senior Judge Han-
sen joined.

## COUNSEL

**ARGUED:** Mark Lebow, YOUNG & THOMPSON, Arlington, Vir-
ginia, for Appellant. C. Edward Polk, Jr., Associate Solicitor,

UNITED STATES PATENT & TRADEMARK OFFICE, Arlington, Virginia, for Appellee. **ON BRIEF:** Thomas W. Perkins, YOUNG & THOMPSON, Arlington, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Dennis E. Szybala, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; John M. Whealan, Solicitor, Cynthia C. Lynch, Associate Solicitor, Arlington, Virginia, for Appellee.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In this appeal, we consider whether the United States Patent and Trademark Office may reject an application to register a trademark because the application contains multiple marks. For the reasons that follow, we conclude that it may. Accordingly, except for the appeal of a subsidiary point that we dismiss for lack of jurisdiction, we affirm the judgment of the district court.

I.

On March 19, 2001, Humanoids Group registered the mark[1] "Humanoids" with the Institut National de la Propriete Industrielle of the Republic of France. Under § 44(d) of the Lanham Act, 15 U.S.C. § 1126(d) (2000), Humanoids Group could claim priority for use of the mark in the United States as of this date, if it filed an application to register the mark with the United States Patent and Trademark Office ("PTO") within the next six months.[2]

---

[1]A "mark" is a word, phrase, symbol or design, or a combination thereof, that identifies and distinguishes the source of the goods or services of one party from those of others. 15 U.S.C. § 1127 (2000).

[2]Generally, the Lanham Act provides that an applicant seeking to register a trademark in the United States may claim a nationwide right of priority for use of the mark as of the filing date of its application with the PTO. *See* 15 U.S.C. § 1057(c) (2000). However, § 44(d) provides that an applicant who has registered a mark with certain foreign registries, including the Institut National, may claim priority in the United States as of the date of the foreign filing if the applicant files an application with the PTO within six months of that date. *See id.* § 1126(d).

On the last day of the six-month period, September 19, 2001, Humanoids Group filed an application with the PTO that contained the mark "Humanoids." The application identified the mark submitted for consideration as "Humanoids," stated that the application was filed pursuant to § 44(d) of the Lanham Act (which requires that the mark in the application and the previously-filed foreign mark be the same), and noted the serial number of the French trademark application for the mark "Humanoids." But, the application also presented another mark, "Graphic Stories." The application stated that "[a] drawing page displaying the mark in conformance with 37 C.F.R. 2.52 is submitted with this application," and, on the attached drawing page, identified "Graphic Stories" as the mark it sought to obtain.

The PTO accepted Humanoids Group's application and assigned it a September 19 filing date, but treated it as an application for the mark set forth on the drawing page — "Graphic Stories." Because the six-month window expired the next day, the PTO's failure to treat the application as one for the "Humanoids" mark caused Humanoids Group to lose the right to claim use of that mark in the United States as of its March 19 French filing date. Thus, another party's May 4, 2001 application with the PTO to register the "Humanoids" mark gained that party priority over use of the mark in the United States.

In an effort to lay claim to the French filing date, and maintaining that it had committed only a "scrivener's error" in identifying "Graphic Stories" as its mark in the September 19 application, Humanoids Group petitioned the PTO to designate "Humanoids" as the mark submitted in that application. The PTO declined, pointing to its regulatory requirement that an application must present only one mark and to its policy of relaxing this requirement and granting a filing date to an application containing multiple marks only when the body of an application and its drawing page present different marks, and then only by permitting the mark presented on the drawing page to constitute the submitted mark. The PTO also noted the general interest in avoiding "impractical and time consuming" procedures and "delay" of "the entry of . . . mark[s] into the Office's automated systems."

Humanoids Group then filed this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (2000), seeking

a judgment that the PTO's denial of its petition violated the APA and an order substituting "Humanoids" as the mark submitted in the September 19 application. The district court granted summary judgment to the PTO. The court reasoned that PTO regulations limit an application to one mark at the time the application is filed, that the PTO acted reasonably in adopting a policy of granting a limited exception to this requirement by looking to the mark identified on the drawing page, and that the PTO correctly applied these regulations and policies in denying Humanoids Group's petition. Humanoids Group appeals.

## II.

An entity must complete two, distinct steps to register a mark with the PTO. First, the entity must submit an application that meets relevant requirements in order to receive a filing date. Second, the entity must meet more detailed requirements to secure final approval of the application to obtain registration. This case involves only the first of these steps.

In 1998, Congress enacted the Trademark Law Treaty Implementation Act, Pub. L. No. 105-330, 112 Stat. 3064 (1998) (codified in scattered sections of 15 U.S.C.). That statute affected several changes to the underlying Trademark Act of 1946 and instructed that "[t]he Director [of the PTO to] promulgate rules prescribing the requirements for the application and for obtaining a filing date herein" and "[t]he applicant [to] comply with such rules or regulations as prescribed by the Director." 15 U.S.C. § 1051(a) (2000).

Consistent with this charge and the changes made by the Act, the PTO promulgated regulations providing that in order to receive a filing date, an application must contain:

(1)   The name of the applicant;

(2)   A name and address for the correspondence;

(3)   A clear drawing of the mark;

(4)   A listing of goods or services; and

(5)   The filing fee. . . .

37 C.F.R. § 2.21 (2003). When the PTO receives an application, it labels the application with a receipt date and then reviews the application for compliance with these "minimum requirements for receipt of a filing date." Patent & Trademark Office, U.S. Dep't of Commerce, Trademark Manual Examining Procedure ("PTO Manual") § 203 (3d ed. 2003). If the PTO determines that an application contains the required elements, the PTO assigns the application a filing date as of the date of receipt and enters the mark into its Trademark Electronic Search System, which the public may access through the PTO's website.[3]

Humanoids Group contends that the PTO violated the APA in interpreting one of these "minimum requirements" — the requirement that the application contain "[a] clear drawing of the mark" — in the case at hand and that the district court erred in holding to the contrary and granting summary judgment to the PTO. 37 C.F.R. § 2.21(a)(3). We review a grant of summary judgment de novo. *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 349 (4th Cir. 2001). However, because Humanoids Group brings this action pursuant to the APA, we conduct our review in accordance with the standards announced therein. Under the APA, we may, "[t]o the extent necessary," "decide all relevant question of law" and "interpret constitutional and statutory provisions." 5 U.S.C. § 706. We can reverse an agency only if we find that its actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

---

[3]"Timely public notification of the filing of applications is important because granting a filing date to an application potentially establishes a date of constructive use of the mark." PTO Manual § 807. Constructive use "establishes a priority date with the same legal effect as the earliest actual use of a trademark at common law;" all ownership rights in a mark flow from prior use. *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001). Thus, publication of the filing date, through the electronic search system puts the world — those already using that mark and those contemplating investing in use of a similar mark — on notice that use may be limited in the future. *See generally id.* at 572; *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395 (3d Cir. 1985).

### III.

Humanoids Group argues that the PTO has misinterpreted the requirement, set forth in its regulation, that to receive a filing date an application must contain "[a] clear drawing of the mark." 37 C.F.R. § 2.21. The PTO interprets this regulatory requirement to mean that an application must present *only* one drawing of one mark. *See In re Lavorazioni*, 61 U.S.P.Q.2d 1063, 1063 (Comm'r Pat. 2001) ("An application that includes two or more drawings displaying materially different marks does not meet this requirement and is not entitled to a filing date."); *see also* PTO Manual § 807.03; Patent & Trademark Office, U.S. Dep't of Commerce, Exam Guide No. 3-99 II.A (Oct. 30, 1999) ("Exam Guide"). Humanoids Group argues that the regulation should instead be interpreted to require merely that an application contain *at least* one drawing of the mark sought to be registered. Brief of Appellant at 10.

Generally, courts must defer to an agency's interpretation of its own regulation, regarding that interpretation as "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks and citation omitted); *see also Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003). Humanoids Group, however, argues that this deferential standard is not warranted here. Alternatively, it maintains that even if the deferential *Auer* standard applies, we must reject the PTO's interpretation. We consider each of these contentions in turn.

### A.

Humanoids Group contends that the PTO's interpretation of § 2.21 does not warrant deference for several reasons.

First, Humanoids Group argues that the PTO did not adopt its interpretation in a formal enough manner to merit judicial deference. In support of this argument, Humanoids Group points to the holding in *Christensen v. Harris Co.*, 529 U.S. 576, 587 (2000), that agency interpretations not subject to notice and comment rulemaking — such as "interpretations contained in policy statements, agency manuals, and enforcement guidelines" — "lack the force of law" and, therefore,

"do not warrant *Chevron*-style deference." But this holding addresses only an agency's use of a policy statement, manual, or the like to interpret a *statute*; it does not address the deference to be afforded when an agency employs these materials to state the agency's interpretation of its own *regulations*. *See, e.g.*, *id.* at 587-88 (conducting a separate analysis under *Auer* after determining that *Chevron*-style deference did not apply); *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304 (D.C. Cir. 2000) ("[A]gency interpretations that lack the force of law (such as those embodied in opinion letters and policy statements) do not warrant *Chevron*-style deference when they interpret ambiguous *statutes* but do receive deference under *Auer* when interpreting ambiguous *regulations*.") (emphasis in original) (internal quotation marks and citation omitted). When an agency interprets its own regulation, as opposed to a statute, *Auer* deference applies.

However, Humanoids Group also offers several arguments as to why, even if *Auer* generally requires judicial deference to an agency interpretation of its own regulations, we should not defer to the PTO here. Noting that deference under *Auer* is due "only when the language of the regulation is ambiguous," *Christensen*, 529 U.S. at 588, Humanoids Group asserts that because the district court found (and the PTO argues) that the "plain language" of § 2.21 "[u]nambiguously" limits an application to one mark, we cannot now afford deference to the PTO's interpretation of the assertedly "unambiguous" regulation.

Of course, determining whether a regulation or statute is ambiguous presents a legal question, which we determine *de novo*. *See, e.g.*, *United States v. Mitchell*, 39 F.3d 465, 468 (4th Cir. 1994). Examination of the language in § 2.21 leads us to conclude that the regulation is indeed ambiguous. Section 2.21 merely requires that an application "contain[ ]" "[*a*] clear drawing of *the* mark" (emphasis added); it does not define what constitutes "a clear drawing," nor does it address the submission of multiple drawings or marks. 37 C.F.R. § 2.21. This language neither plainly compels nor clearly precludes the PTO's interpretation; thus its precise import is ambiguous and certainly "not free from doubt." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150 (1991) (internal quotation marks and citation omitted).

Nor, contrary to Humanoids Group's further contention, does the PTO's interpretation of § 2.21 constitute a "*de facto* new regulation," *Christensen*, 529 U.S. at 588, thereby removing it from the scope of *Auer*. The PTO's interpretation — that § 2.21 requires an application to present only one mark — simply reflects the use of the singular in § 2.21 itself. 37 C.F.R. § 2.21(a)(1)(3) ("A clear drawing of the mark."). Such an interpretation cannot be considered to be so far afield of the regulation's text as to constitute a "*de facto* new regulation." *Id.*; *cf. Selgeka v. Carroll*, 184 F.3d 337, 343 (4th Cir. 1999) (interpreting statutory language referencing "a procedure" to mean "*a single procedure*") (emphasis in original).

Finally, Humanoids Group argues that we should not defer to the PTO's interpretation of § 2.21 because the PTO has not offered the "reasoned" statement of this interpretation that *Auer* requires. As noted above, however, the PTO has explained its interpretation in a Commissioner's decision, *In re Lavorazioni*, 61 U.S.P.Q.2d 1063, in the PTO Manual, and in the Exam Guide No. 3-99. These expressions clearly constitute the PTO's interpretation adopted upon its "fair and considered judgment" under *Auer*, 519 U.S. at 461-63 (recognizing that even an agency's amicus brief filed during the course of litigation expressing its understanding of the meaning of a regulation can suffice to state an "interpretation" warranting deference). *See also United States v. Deaton*, 332 F.3d 698, 712-13 (4th Cir. 2003) (upholding Army Corps of Engineers' interpretation of its regulation set forth in agency's "Wetlands Delineation Manual" after affording it *Auer*-like deference); *Reutter v. Barnhart*, ___ F.3d ___, 2004 WL 1335850, at *3 (8th Cir. June 16, 2004) (upholding Social Security Administration interpretation of its regulation set forth in agency publication titled "Programs Operations Manual System" under *Auer* deference).

Thus, the deferential standard set forth in *Auer* governs our review of the PTO's interpretation of § 2.21. We will, therefore, uphold the PTO's interpretation unless Humanoids Group demonstrates that this interpretation is "plainly erroneous or inconsistent with the regulation" itself. *Auer*, 519 U.S. at 461. We now turn to that inquiry.

### B.

Humanoids Group maintains that the PTO's interpretation is both "plainly erroneous" and "inconsistent with" PTO regulations. *Auer*, 519 U.S. at 461.

First, it maintains that the PTO's interpretation of § 2.21 conflicts with the Lanham Act and therefore is plainly erroneous. The Lanham Act describes two classes of applicants who "may request registration" of a trademark — owners of a "trademark [already] used in commerce," and "[a] person who has a bona fide intention . . . to use a trademark in commerce." 15 U.S.C. § 1051(a)-(b). On the basis of these provisions, Humanoids Group argues that "the mark" referenced in § 2.21 necessarily means the mark that the applicant *intends* to register. From this, Humanoids Group extrapolates that the Lanham Act imposes an affirmative duty on the PTO to identify from an application the mark that the applicant intends to register, a duty that requires the PTO, when confronted with an application containing two or more marks, to contact the applicant and ascertain its intent. Humanoids Group maintains that the PTO has "excis[ed] the [statutory] intent requirement" by rejecting applications that contain multiple marks without making such an inquiry. Brief of Appellant at 10-12.

Of course, the Lanham Act permits only "[a] person who has a bona fide intention . . . to use a trademark in commerce [to] request registration of its trademark." § 1051(b)(1). But nothing in the statute indicates that such an "intent requirement" gives rise to an affirmative duty on the part of the PTO. No provision of the Lanham Act specifies how the PTO must process an application setting forth multiple marks, some of which the applicant does not intend to register.[4] Cer-

---

[4]Humanoids Group also argues that we should reject the PTO's interpretation of § 2.21 because requiring the PTO to ask applicants who submit applications containing multiple marks which mark they *intend* to register would constitute a preferable interpretation. According to Humanoids Group, its interpretation would not unduly delay notice to the public or place an excessive burden on the PTO, yet would more accurately determine an applicant's intent. Whether such an interpretation is preferable appears doubtful. If the PTO granted an applicant a filing date based on an application containing multiple marks, this would likely delay entry of the application into the electronic search system while the PTO attempted to identify the intended mark; any delay in public notice of the filing date might well "raise the risk of harm to third parties who may have acted in reliance on the record of pending applications." *In re Tetrafluor Inc.*, 17 U.S.P.Q.2d 1160, 1162 (Comm'r Pat. 1990). But, even if Humanoids Group's interpretation of § 2.21 would be superior to

tainly no statutory provision precludes the approach adopted by the PTO of generally rejecting applications that present multiple marks. If anything, such an "intent requirement" would seem to place the onus on the applicant — here Humanoids Group — to submit a drawing of the mark that it intends to trademark, and only that mark. Thus, the PTO's interpretation of § 2.21 does not contravene the Lanham Act.

Alternatively, Humanoids Group contends that the PTO's interpretation of § 2.21 is inconsistent with the PTO's own regulations. Brief of Appellant at 13-15. Specifically, Humanoids Group points out that § 2.21 (setting forth the minimum requirements for receipt of a filing date) does not have language expressly prohibiting multiple marks, but a subsequent regulation, § 2.52 (setting forth requirements related to the drawing for receipt of registration), does expressly provide that a drawing "must show only one mark." From this, Humanoids Group reasons that while the "one mark" requirement must be satisfied to secure registration, it need not be satisfied to receive a filing date, and that § 2.21 cannot, therefore, be interpreted to contain the "one mark" requirement.

However, Humanoids Group fails to appreciate the differing context and purpose of the two regulations. Near the outset of the PTO's regulations, § 2.21 sets forth the minimum requirements for receipt of a *filing date* and provides that one such requirement is that an application contain "[a] clear drawing of the mark." Later, § 2.52, titled "Types of drawings and format for drawings," sets forth detailed instructions on how a drawing and mark must be presented (how to represent marks with three dimensional features, with color, to demonstrate motion, etc.) to *register* a mark after the PTO has already granted a filing date to the application. § 2.52(b)(2). In an unenumerated paragraph preceding the list of detailed instructions, § 2.52

---

the PTO's that does not render the PTO's interpretation "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461. Thus, it provides no ground for rejecting the PTO's interpretation. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("Our task is not to decide which among several competing interpretations best serves the regulatory purpose.").

states: "A drawing depicts the mark sought to be registered. The drawing must show only one mark. The application must include a clear drawing of the mark *when the application is filed*." § 2.52(a) (emphasis added). This brief, prefatory paragraph merely recaps basic requirements relating to "when the application is filed." § 2.52(a). Section 2.52 then goes on to describe the additional and more complicated issues involving the mechanical details of rendering a drawing and mark for purposes of registration. Contrary to Humanoids Group's assertion, then, § 2.52 entirely accords with (and, indeed, reiterates) the PTO's interpretation of its preceding companion regulation, § 2.21.

Thus, we find the PTO's interpretation of § 2.21 — requiring the submission of only one mark — to be neither plainly erroneous nor inconsistent with the PTO's regulations.[5]

IV.

For all of these reasons, the judgment of the district court is

*AFFIRMED IN PART AND DISMISSED IN PART.*

---

[5]In its appellate briefs, Humanoids Group also challenged the PTO policy that permits an exception to the one mark rule in certain, limited circumstances. *See In re Lavorazioni*, 61 U.S.P.Q.2d at 1063-64. However, at oral argument, Humanoids Group acknowledged that if we upheld the PTO's interpretation of § 2.21, as we have, invalidating this policy would not afford it any relief. Thus, Humanoids Group does not have standing to challenge that policy. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). Accordingly, we lack jurisdiction to consider this point and so must dismiss this portion of the appeal.