PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

D.L., by and through his Parents
and Guardians, K.L. and S.L.;
K.L.; S.L., in their own right,

       *Plaintiffs-Appellants,*

       v.

BALTIMORE CITY BOARD OF SCHOOL
COMMISSIONERS,

       *Defendant-Appellee,*

       and

BALTIMORE CITY PUBLIC SCHOOLS,

       *Defendant.*

 

NATIONAL SCHOOL BOARDS
ASSOCIATION; MARYLAND
ASSOCIATION OF BOARDS OF
EDUCATION; VIRGINIA SCHOOL
BOARDS ASSOCIATION,

       *Amici Supporting Appellee.*

No. 11-2041

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:10-cv-02834-MJG)

Argued: October 25, 2012

Decided: January 16, 2013

Before NIEMEYER, GREGORY, and THACKER,
Circuit Judges.

---

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Thacker joined.

---

## COUNSEL

**ARGUED:** David G. C. Arnold, West Conshohocken, Pennsylvania, for Appellants. Leslie Robert Stellman, HODES, PESSIN & KATZ, PA, Towson, Maryland, for Appellee. **ON BRIEF:** Katharine A. Linzer, LINZER LAW, LLC, Towson, Maryland, for Appellants. Tammy L. Turner, Tiffany Sharnay Puckett, Stephanie J. Robinson, CITY BOARD OF SCHOOL COMMISSIONERS, Baltimore, Maryland, for Appellee. Francisco M. Negrón, Jr., NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia; John F. Cafferky, Andrea D. Gemignani, BLANKINGSHIP & KEITH, PC, Fairfax, Virginia, for Amici Supporting Appellee.

---

## OPINION

GREGORY, Circuit Judge:

Appellants D.L. and his parents, K.L. and S.L., appeal the district court's grant of summary judgment to the Baltimore City Board of School Commissioners ("BCBSC") and Baltimore City Public Schools. They contend that Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), compels BCBSC to provide D.L. educational services related to certain disorders even though D.L. is enrolled exclusively in a private religious school. They also claim that BCBSC's requirement that D.L. attend a public school in

order to receive Section 504 services is unconstitutionally burdensome on their right to make educational decisions under *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). Because we do not read Section 504 to apply an affirmative obligation on school districts to provide services to private school students and because Appellants retain full educational discretion, we affirm the district court's ruling.

I.

D.L., who was in eighth grade when he and his parents filed this case in 2010, has suffered from difficulties with attentiveness, focus, and impulsivity since he was in kindergarten. In 2007, D.L.'s parents brought him to a specialist who diagnosed him with Attention Deficit Hyperactivity Disorder ("ADHD") and anxiety. In 2009, BCBSC determined that D.L. did not qualify for services under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 ("IDEA"), but that he was eligible under Section 504. However, BCBSC informed D.L.'s parents that they could not provide Section 504 services unless D.L. enrolled in one of the district's public schools. Because Maryland law does not permit simultaneous dual enrollment in a private and public school, D.L. would have had to withdraw from his Yeshiva—a private religious school he attended at the time—to enroll in a local public school.

D.L.'s parents challenged BCBSC's position before a Hearing Examiner appointed by BCBSC. After the examiner decided that Section 504 does not require that BCBSC allow D.L. to access special education services while enrolled in a non-public school, the parents brought suit in the United States District Court of Maryland. BCBSC filed a motion for summary judgment, and D.L. and his parents responded with their own motion for partial summary judgment. On August

30, 2011, the court granted BCBSC's motion and denied Appellants'. Appellants timely appealed.[1]

## II.

We review the district court's grant of a motion for summary judgment *de novo. Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). Summary judgment is appropriate only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 (4th Cir. 2012). In determining whether a genuine issue of material fact exists, we view the facts, and draw all reasonable inferences, in the light most favorable to the non-moving party. *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011).

Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794. The implementing regulations for Section 504 require that public schools make a FAPE available "to each qualified handicapped person who is in the recipient's jurisdiction . . . ." 34 C.F.R. § 104.33(a). An appropriate education includes "provision of regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons . . . ." 34 C.F.R. § 104.33(b)(1). As long as the public schools make a FAPE available, they bear no obligation to pay for a child's education in a private school. 34 C.F.R. § 104.33(c)(4).

---

[1]While this appeal was pending, D.L. enrolled at a boarding school in Richmond, Virginia for the 2012-13 school year. We ordered the parties to submit supplemental briefing on the question of whether D.L.'s move to Richmond rendered this case moot. As of December 26, 2012, D.L. has left the Richmond program and returned home to Baltimore. As such, there is no grounds for a mootness finding and we do not consider it here.

Appellants argue that these regulations mandate that BCBSC provide D.L. with a FAPE at a public school even while he continues to enroll in and attend a private school. They read the language, "provide each Section 504 eligible student within its jurisdiction with a [FAPE]" to mean that public schools need to go further than just making the education available. *See* 34 C.F.R. § 104.33(a).

The plain language of the statute and the regulations does not make clear whether public schools are required to provide services to students enrolled in private schools. While § 104.33(c)(4) does state that public schools need not finance a child's "education" in private school, it is unclear whether the term "education" here encompasses special education services. Appendix A to Part 104 of the regulations provides some clarification, "[i]f . . . a recipient offers adequate services and if alternate placement is chosen by a student's parent or guardian, the recipient need not assume the cost of the outside services." 34 C.F.R. § 104 app. A. However, while the Appendix explains that a public school need not pay for services when a parent accesses those services from a provider other than the public school, it does not answer whether a private school student can access those services from the public school itself.

The Department of Education's Office for Civil Rights issued a direct clarification of the disputed regulation in an opinion letter. *OCR Response to Veir Inquiry Re: Various Matters*, 20 IDELR 864 (1993) ("Letter to Veir"). *Letter to Veir* states, in part, "[w]here a district has offered an appropriate education, a district is not responsible under Section 504, for the provision of educational services to students not enrolled in the public education program based on the personal choice of the parent or guardian." *Id.* Appellants attempt to parry *Letter to Veir* by arguing that it is a response to questions related to the provision of services at home for a homeschooled student whereas D.L. is willing to come to the public school to receive services. However, while the question

posed to OCR in *Letter to Veir* does specifically request clarification about whether a public school must provide services at home, OCR does not similarly cabin its response.

Where a regulation is ambiguous we must grant deference to an agency's interpretation of its own regulation. *Auer v. Robbins*, 519 U.S. 452 (1997); *see also Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000); *Humanoids Grp. v. Rogan*, 375 F.3d 301, 306 (4th Cir. 2004). We grant *Auer* deference even when the agency interpreting its regulation issues its interpretation through an informal process, such as an opinion letter. *Humanoids Grp.*, 375 F.3d at 306; *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (Department of Labor's interpretation of its own regulations as explained in opinion letters deserved *Auer* deference). Where an agency has made an interpretation of its own regulation, as the Department of Education has done in *Letter to Veir*, that interpretation is controlling unless it is "plainly erroneous or inconsistent with the regulation." *See Auer*, 519 U.S. at 461.

A comparison of IDEA and Section 504 lends support to *Letter to Veir*'s interpretation of 34 C.F.R. § 104.33(c)(4). A requirement that extends to provision of services while students are enrolled in private schools creates an inescapable conflict with the limitations that Congress placed on school district responsibilities under IDEA. Before Congress amended IDEA in 1997, courts had interpreted IDEA as granting eligible children enrolled in private schools an individual right to special education and services. *Foley v. Special Sch. Dist. of St. Louis Cnty.*, 153 F.3d 863, 864 (8th Cir. 1998). The 1997 amendments, however, clarified that states only had to allocate a proportionate amount of funds received from the federal government to eligible students in private schools.[2] 20 U.S.C. § 1412(a)(10)(A)(i). The amendments and

---

[2]The amount of funds a state receives from the federal government is only a small fraction of the cost of providing for the special education of students. *Russman v. Bd. of Educ. of City of Watervliet*, 150 F.3d 219, 221 (2d Cir. 1998). As such, a state is only required to allocate a proportionate amount of this small fraction to eligible private school students. *Id.*

related regulations established that "[n]o parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." 34 C.F.R. § 300.137. Under Appellants' interpretation of Section 504, however, school districts would have to provide and fully fund services that an eligible private school student requested under a Section 504 plan. Because all students who are eligible for services under IDEA are also covered for those services under Section 504, this scenario would entitle all IDEA-eligible students in a private school to full services using Section 504. *See Letter to Williams*, 21 IDELR 73 (OSEP 1994). In other words, Appellants' interpretation of Section 504 would create an individual right to special education and related services where none exists. This interpretation flies directly in the face of the limitations that Congress imposed on school districts' obligations under IDEA by reading an affirmative obligation into Section 504, an anti-discrimination statute. *See Sellers v. Sch. Bd. of City of Manassas, Va.*, 141 F.3d 524, 528 (4th Cir. 1998).

Nonetheless, Appellants argue that Section 504 must be interpreted broadly because it is a remedial statute. *See Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634 (1984) (stating that Section 504 has a remedial purpose). Indeed, the Supreme Court has given credence to the familiar canon of statutory construction that remedial legislation should receive a broad interpretation to effectuate its purposes. *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Appellants believe this canon compels the conclusion that Section 504 requires school districts to provide services to all eligible students, including private school students, within their jurisdiction.

The purpose of Section 504 does not, however, extend as far as Appellants assert that it should. Section 504 and its implementing regulations prohibit discrimination on the basis of disability, not on the basis of school choice. *See* 34 C.F.R. § 104.4(b)(1)(ii)-(vii); *Burke Cnty. Bd. of Educ. v. Denton*,

895 F.2d 973, 984 (4th Cir. 1990). Further, we have noted that Section 504 "is not intended to impose an affirmative obligation on all recipients of federal funds." *Id.* Public schools are only required to make a FAPE available on equal terms to all eligible children within their district. Because BCBSC provided D.L. with access to a FAPE on equal terms with all other eligible students in the district, it has satisfied Section 504's imperative.

Appellants argue that the universal coverage of Section 504's "child find obligation" implies that the district is responsible for universal provision of services. A school district must meet its child find obligations by "[u]ndertak[ing] to identify and locate every qualified handicapped person" in the school's district and "[t]ak[ing] appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty." 34 C.F.R. § 104.32(a)-(b). Indeed, courts and commentators alike have recognized the child find obligation as an affirmative obligation. *See N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 16 (D.D.C. 2008); Amy L. MacArdy, *Jamie S. v. Milwaukee Public Schools: Urban Challenges Cause Systemic Violations of the IDEA*, 92 Marq. L. Rev. 857, 863 (2009). But, the affirmative obligation is to ensure universal access and awareness, not universal provision. Because of Section 504 and its child find provision, children like D.L. know they have the opportunity to enroll in public school to take advantage of services available to all eligible individuals. But, this child find obligation differs from a school district's obligations for service provision under Section 504, which are not affirmative. *See Burke Cnty. Bd. of Educ.*, 895 F.2d at 984. Section 504 and its implementing regulations do not require that public schools provide access to eligible individuals that opt out of the program by enrolling in private schools.

The practical and programmatic challenges associated with reading an affirmative universal service provision requirement into Section 504 provide additional support for limiting ser-

vice provision to students enrolled in public schools. Many of the services provided under Section 504 must take place in "real time" during class. Harvey C. Parker, *The ADHD Handbook for Schools* 93-128 (2006) (discussing nine prevalent classroom-based interventions used for children with ADHD). For instance, for a student with ADHD, schools often need to implement individualized structuring, cueing, and reinforcement while a class session is taking place to improve behavior and learning. *See* Gerard A. Gioia & Peter K. Isquith, *New Perspectives on Educating Children with ADHD: Contributions of the Executive Functions*, 5 J. Health Care L. & Pol'y 124, 147-51 (2002). A public school would have to send its staff to D.L.'s private school to initiate and implement these methodologies. Coordination between teachers, psychologists, aides, and other public school staff is essential to carrying out an effective Section 504 program. It would be taxing on staff and budgets alike to organize this sort of coordination where the child is split between school sites. Last, it would be extremely difficult to coordinate the calendars, start and stop times, and transportation of multiple private and religious schools with each public school where service provision takes place.

Appellants rely heavily on a single case out of the Pennsylvania Supreme Court to rebut the many arguments that work against their interpretation. In *Lower Merion School District v. Doe*, 931 A.2d 640, 641 (Pa. 2007), a kindergarten-aged child, Doe, was not eligible for special education services under IDEA, but did qualify to receive occupational therapy under Section 504. Pursuant to a Pennsylvania law allowing dual enrollment, Doe's parents placed him in a private all-day kindergarten program to attend classes and in a public school to receive the therapy that the school district offered. *Id.* The school district refused to provide services to Doe unless the student took classes at the public school. *Id.* The court interpreted both Section 504 and Pennsylvania's implementing regulations that state that a school district must provide services to any eligible student enrolled in the district. *Id.* at 643-

44. The regulations did not specify that a student must actually take classes to gain access to services. *Id.* at 644. As such, the court concluded that "[s]ince Doe is entitled to § 504 benefits and dually enrolled in private school and the District's school, we hold the District is required to provide appropriate § 504 entitlements." *Id.* at 645.

*Lower Merion* fails to lend insight into this case because the court's analysis hinges on Pennsylvania's dual enrollment provisions. Unlike Pennsylvania, Maryland does not permit dual enrollment. While the *Lower Merion* court does engage in analysis of Section 504's FAPE requirements, it does not specify whether such requirements would apply where a student is not dually enrolled. The Third Circuit limited *Lower Merion*'s holding accordingly when it decided in a subsequent case that a student was not entitled to Section 504 services because she did not continue her enrollment in a public school after she had transferred to a private school. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 273-74 (3d Cir. 2007). It is also notable that the *Lower Merion* court ignored *Letter to Veir*, which would have directly contradicted the court's holding if Doe was not dually enrolled.

Appellants attempt to avoid this interpretation of *Lower Merion* by arguing that Maryland's laws prohibiting dual enrollment violate the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2. The argument is circular. Maryland's prohibition against dual enrollment only violates the Supremacy Clause if Section 504 requires provision of services to students regardless of their school choice. Because we hold that it does not, there is no conflict between Maryland's law and Section 504.

Overall, the administrative guidance, statutory purpose, case law, and policy considerations compel our holding that D.L. is not entitled to Section 504 services if he remains enrolled at a private institution.

We next address whether BCBSC's prerequisite that private school students cease enrollment in private religious institutions and enroll in public schools in order to access Section 504 services is a violation of their constitutional rights under *Pierce*, 268 U.S. 510 and *Yoder*, 406 U.S. 205.

In *Pierce*, the Supreme Court struck down an Oregon law that would have forced parents to send their children to public schools. 268 U.S. at 530-31. The Court explained that "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535. In *Yoder*, members of the Amish religion were convicted for violating Wisconsin's compulsory education law requiring that students attend school until the age of 16. 406 U.S. at 207. The church members argued that a compulsory education system violated their First and Fourteenth Amendment rights because their religious beliefs required that they leave school after the eighth grade to separate themselves from worldly influence. *Id.* at 209-10. The Court held for the church members, noting that they had presented extensive evidence that compulsory education "would gravely endanger if not destroy the free exercise of [their] religious beliefs." *Id.* at 219.

The critical distinction is that *Pierce* and *Yoder* addressed laws requiring that students attend public schools or face criminal repercussions, while Appellants retain full discretion over which school D.L. attends. Nonetheless, Appellants argue that BCBSC's interpretation of the law creates an undue burden on their constitutional rights, presumably by forcing a decision between religious and educational freedom, on the one hand, and bearing the increased cost of services, on the other.

BCBSC's policy may raise the overall cost of D.L.'s private education, but this does not offend D.L.'s constitutional rights. The Supreme Court has explained that a statute does

not violate the Free Exercise Clause merely because it causes economic disadvantage on individuals who choose to practice their religion in a specific manner. *Braunfield v. Brown*, 366 U.S. 599, 606 (1961). In *McCarthy v. Hornbeck*, 590 F. Supp. 936 (D. Md. 1984), parents of children attending private religious schools brought a Free Exercise claim against the Maryland schools. They alleged that a school transportation system that provides transportation exclusively to public school students places an impermissible burden on the free exercise of religion because it "conditions eligibility for an otherwise available general welfare benefit upon the non-assertion of plaintiffs' right to send their children to private, church-related schools." *Id.* at 938-39. The court found that the school transportation system did not infringe on plaintiffs' rights because "at most [it placed] an indirect economic burden on plaintiffs' right to freely exercise their religion." *Id.* at 945. Similarly, BCBSC's policy does not substantially infringe on Appellants' right to attend a private religious school. D.L.'s parents must shoulder the full cost of their decision to exercise their religious beliefs. Here, the full cost of education includes the cost of services that D.L. needs to address his challenges.

Appellants' assertion that BCBSC's policy creates an undue burden also clashes with case law upholding government's ability to make policies and curricular decisions in the best educational interest of students. In *Hooks v. Clark County School District*, 228 F.3d 1036, 1037-38 (9th Cir. 2000), a family argued that it was unconstitutional for a school district to deny speech therapy services at a public school to an IDEA-eligible homeschooled child. The court held that "attaching receipt of IDEA services to institutional school attendance . . . constitutes 'reasonable government regulation' that does not offend our Constitution. *Id.* at 1042 (quoting *Runyon v. McCrary*, 427 U.S. 160, 178 (1976)). The court explained that while the plaintiff might "have a constitutional right to educate [their child] at home, they do not have

a constitutional right to state-funded speech therapy services." *Hooks*, 228 F.3d at 1042.

Similarly, in *Swanson v. Guthrie Independent School District No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998), plaintiffs argued that they had a constitutional right to homeschool their child pursuant to their religious beliefs and send their children to a public school on a part-time basis to take selected courses. The school board prevented them from doing so because of a policy prohibiting part-time attendance. *Id.* The court held that the school district's policy was proper because the district had the right to allocate resources and control curriculum as it saw fit. *Id.* at 700.

The right to a religious education does not extend to a right to demand that public schools accommodate Appellants' educational preferences. BCBSC has legitimate financial, curricular, and administrative reasons to require that D.L. enroll exclusively in a public school in order to take advantage of Section 504 services. The school board need not serve up its publicly funded services like a buffet from which Appellants can pick and choose. *See Swanson*, 135 F.3d at 700.

Because Appellants retain full discretion over school enrollment and because BCBSC has taken reasonable measures to fulfill its mission, we find that BCBSC's policies place no undue burden upon Appellants' constitutional rights.

### III.

For the reasons discussed above, we affirm the decision of the district court.

*AFFIRMED*